# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### August 25, 2011 Session

## JAMES JOHNSON AND WIFE, ELAINE JOHNSON v. THE TORRINGTON COMPANY, ET AL.

**Appeal from the Circuit Court for Giles County**
**No. CC10292      Robert Lee Holloway, Jr., Judge**

---

**No. M2010-01924-COA-R3-CV - Filed June 19, 2012**

---

The plaintiff was severely injured while working on the premises of his employer. Because the employer was immune from liability in tort under the Workers' Compensation statutes, the employee's negligence suit named as defendants two other companies whose equipment was implicated in his injury. After a five-day trial, the jury found that the employer was solely at fault for the plaintiff's injuries, resulting in no award. The plaintiff then filed a motion for new trial. The trial court granted the motion ten months after it was filed, declaring that in his capacity as the thirteenth juror he had found the verdict to be against the weight of the evidence. The case was tried before a second jury, which reached a different verdict, finding that one of the defendant companies was 90% at fault for the plaintiff's injury while the plaintiff himself was 10% at fault. The net verdict for the plaintiff amounted to $2,925,000. The defendant company argues on appeal that the trial court erred in vacating the first jury verdict, that the second jury verdict was "contrary to the manifest weight of the evidence," and that the amount of the verdict was excessive. We affirm the jury verdict and the judgment based on it.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

James Campbell Bradshaw, Michael David Hornback, Nashville, Tennessee, for the appellant, The Torrington Company.

George Benson Boston, Christopher V. Sockwell, Ryan Perry Durham, Lawrenceburg, Tennessee, for the appellees, James Johnson and wife, Elaine Johnson.

# OPINION

## I. A WORKPLACE ACCIDENT

On July 24, 2000, plaintiff James Johnson, a heavy equipment operator and veteran employee of Browning Ferris Industries (BFI) was helping to unload waste from his employer's trucks at the company's transfer station in Giles County. BFI driver Clayton Eslick drove a truck into the station with a waste container that had to be unloaded. The container was filled with a load of swarf[1] that the driver had picked up at a metal bearing factory in Pulaski owned by the defendant Torrington Company.

Mr. Johnson supervised the operation, standing behind the truck and slightly to one side as it prepared to dump its load onto a concrete slab. The hoist on the truck lifted one end of the container and the load slid out of the container and onto the slab. As the hoist began lowering the container, its heavy rear door broke loose from its mooring and swung around, thereby unbalancing the empty container, which tipped over and struck Mr. Johnson, knocking him over and severely injuring him.

The parties are in basic agreement as to the facts outlined above, but they differ as to who was responsible for the accident. A brief discussion of the equipment and procedures involved is essential for an understanding of their respective arguments. The proof at trial showed that BFI's truck had a flat bed that was equipped with a "roll-off hoist" and a cable mechanism to pull a steel waste container towards the front of the hoist. The hoist itself was designed to lift containers to an angle of up to 60 degrees so that waste could be dumped from them.

Rails on the underside of each container were made to fit between matching rails on the hoist. The container itself was designed to slide on rollers attached to the sides of the rails on the hoist. Fold-down stops near the cab of the truck could be hooked into the container to hold it in securely in place. A pair of ratchet tie-down straps bolted to the hoist behind the rear axle could be tightened around the top of a standard container to further secure it to the truck.

The truck and hoist combination was designed to accommodate rectangular open-top containers that were the same length as the hoist, twenty-two feet. But defendant Torrington needed a shorter container that could be placed under a canopy outside its factory without sticking out so rainwater would not collect in it. So, in 1995 the Torrington Company

---

[1]"Swarf" is a waste by-product of defendant Torrington's manufacturing processes. It is a mixture of fine metal particles, coolant used in the metal grinding process, and water from the grinding wheel.

ordered and received two custom-made waste containers from defendant Wastequip Manufacturing Company's predecessor-in-interest.[2]

The custom-made containers were thirteen feet, six inches in length and were taller than standard containers, about eight feet ten inches tall at the front. About halfway along their length, the sides of the containers tapered down at a steep angle, so the rear door of the container was about half as tall as its front wall. Testimony at trial showed that the ratchet straps were placed too far back to hold the container in position during transport and that because of the shorter length of the containers, the fold-down stops had to be unhooked to allow them to slide towards the back of the truck bed for unloading.

It is undisputed that the rear door of the container played a critical role in the accident. The heavy door (referred to by some witnesses as "the tailgate") was hinged along one side of the container and constituted its rear wall.[3] It was held in place by heavy latches. The latches could be released to let the door pivot on its hinges. If the door was open and the hoist was lifted to its full extension, the waste could slide out of the container at a designated location. A length of chain was welded to the outside of the door. A keyhole bracket was welded to the side of the container for the other end of the chain to be hooked into when the door was opened. When the chain was properly hooked into the bracket and secured with a safety catch, the heavy door was held firmly in place at the side of the container, and was restrained from swinging freely.

Torrington contracted with BFI to pick up one of its waste containers every week or two, dump it at the BFI transfer station, and then return it empty to the Torrington factory. This schedule was followed for five years without incident. On July 24, 2000, the process appeared to be going normally. The driver, Mr. Eslick, used the controls inside the cab of the truck to loosen the cable and to raise the hoist so the container could slide on the rollers down the rails to the back of the truck, a step that would have been unnecessary in a standard-sized container. He then lowered the hoist, got out of the truck, opened the container tailgate, and fastened it in place at the side of the container. The driver got back into the cab and lifted the hoist again, allowing the swarf to slide out of the container. He

---

[2]The parties stipulated that Holt Manufacturing fabricated the container at issue and that prior to the accident that is the subject of this lawsuit, Wastequip purchased all the assets and liabilities of Holt Manufacturing. The proof showed that the other corporate parties in this case were also acquired by other companies prior to or during this litigation. BFI was purchased by Allied Waste, Inc., and Torrington was acquired by Timken. To avoid confusion, we will refer to all the corporate parties only by the names that identified them in the initial complaint.

[3]The plaintiff's expert testified that the door weighed "over 400 pounds." The defendant's expert testified that the door weighed "300 or 330 pounds."

then inched the truck forward slowly to allow any swarf remaining in the container to fall to the concrete slab.

Mr. Johnson was standing about six or eight feet behind the rear of the container, waiting for the hoist to come all the way down, so he could help Mr. Eslick by closing the rear door. That put him in harm's way as the truck rolled forward and the chain holding the door in place failed. The door swung out from the side of the container, causing the container to tip over and to hit Mr. Johnson, knocking him to his hands and knees. He attempted to get up, but he was knocked down a second time.

Mr. Johnson was transported by ambulance to a nearby hospital, then life-flighted to a hospital in Huntsville for emergency surgery. His injuries included a fractured pelvis, a urethral tear, rib fractures, collapsed lungs, and nerve damage to his left leg from hip to knee. He was bedridden and unable to walk for about seven months. His wife had to quit her job to take care of him as he healed. Mr. Johnson was able to return to work part-time about eleven months after the accident, and he went on a full-time schedule about a month later, but with reduced duties. He continues to suffer from urological problems and chronic leg and back pain, and he can no longer stand on concrete surfaces for long periods at a time.

## II. A COMPLAINT IN TORT

Mr. Johnson filed a claim for workers compensation benefits from his employer. On July 23, 2001, he and his wife also filed a negligence complaint in the Circuit Court of Giles County, naming Torrington and Wastequip Manufacturing as defendants. The complaint alleged that both defendants were negligent in the design and manufacturing of the waste container involved in the accident, that Torrington was also negligent for failing to properly inspect and maintain the container, and that Mr. Johnson's injuries were a direct result of the defendants' negligence. The plaintiffs asked for a jury trial and for $5 million in compensatory damages for Mr. Johnson's injuries. Mrs. Johnson asked for $1 million for her loss of consortium.

Both defendants filed answers to the complaint. They denied any negligence and asserted that Mr. Johnson was at least partially at fault for his injuries. Torrington denied that its waste container was defective or unreasonably dangerous, but it also argued that the design and fabrication of the waste container was the sole responsibility of Wastequip, and it accordingly filed a cross-complaint, asking for indemnification or contribution from Wastequip for any judgment recovered by the plaintiffs from Torrington. For its part, Wastequip also denied that the waste container was defective or unreasonably dangerous, and suggested that Mr. Johnson's injuries were the result of misuse of the product, superseding cause, and failure to follow proper instructions.

Extensive discovery followed over the course of the next three years, which included taking the depositions of Mr. Johnson's treating physicians as well as of numerous experts in relevant technical fields, such as engineering, metallurgy, product design, and workplace safety.

On December 10, 2002, Insurance Company of the State of Pennsylvania, the workers' compensation insurance carrier for BFI, filed a motion to intervene in the case. The insurance company asserted that because of its payment of workers' compensation benefits to Mr. Johnson, it had obtained a right of subrogation to collect any judgment he obtained against the defendants, up to the amount of benefits it paid.[4] The motion to intervene was granted.

### III. THE FIRST JURY TRIAL AND ITS AFTERMATH

The case was tried for five days before Judge Jim Hamilton, starting on January 23, 2005. Aside from the plaintiffs, testifying witnesses included BFI driver Clayton Eslick, BFI's safety director and its landfill manager, Torrington's maintenance supervisor and a welder who had worked on the container after the accident. Deposition testimony of Torrington's plant manager and Wastequip's fabricating supervisor was also presented to the jury. The depositions of some of Mr. Johnson's treating physicians were read into the record, while others testified in person.

On the final day of trial, Plaintiffs settled with Wastequip and dismissed all claims against it. With Wastequip out of the picture, Torrington argued at closing that the conduct of BFI was the sole cause in fact of the Mr. Johnson's injuries. On that same day, the trial court gave the jury instructions on their role and on the law applicable to the case. Among the instructions given was "Plaintiff may not sue the employer." After deliberations, the jury delivered its verdict.

The first question on the verdict form given to the jury was "Do you find the conduct of Plaintiff James Johnson's employer, BFI/Allied Waste, was the sole cause in fact of the Plaintiff's injuries?" If the answer was "No," then the jury was directed to answer follow-up questions about the fault of Torrington and of Mr. Johnson himself. But the jury's answer

---

[4]A representative of BFI testified out of the presence of the jury that Mr. Johnson was paid $252,930.40 in workers compensation benefits.

was "Yes," thereby pretermitting all other questions.[5]

The trial court accepted the jury's verdict and entered a judgment on February 2, 2006, dismissing all claims against Torrington. The plaintiff's attorney asked the court for permission to interview the jurors, which the court granted.

On March 3, 2006, the plaintiffs filed a motion for new trial pursuant to Tenn. R. Civ. P. 59.02, urging the court to exercise its role as thirteenth juror because "the verdict is contrary to the weight of the evidence presented at trial." The motion was accompanied by three juror affidavits. The three affiants all stated that they had discussed their jury service with the plaintiffs' attorneys, that they believed that Torrington was at least partially at fault for Mr. Johnson's injuries, but that they were led to believe, either on the basis of a misunderstanding of the jury instructions or because of statements made by certain other jurors, that it would help the plaintiffs to obtain a fair judgment against the employer if they held BFI solely responsible.

On November 30, 2006, almost ten months after entering the judgment on the jury verdict, Judge Hamilton ruled on the plaintiffs' motion for new trial. The order stated that the court had made an independent examination of the weight of the evidence and that "[s]aid verdict is against the weight of the evidence. Thus, pursuant to the 13th Juror Rule, the jury verdict is set aside, and the plaintiff's Motion for New Trial is granted."

Defendant Torrington filed an application for an interlocutory appeal of the trial court's decision under Tenn. R. App. P. 9, which the trial court denied, followed by an application for extraordinary appeal under Tenn. R. App. P. 10, which this court denied. Upon the defendant's motion, a different judge was assigned to conduct the second trial. *See* Tenn. R. Civ. P. 59.06.

## IV. THE SECOND JURY TRIAL

The second jury trial was conducted over three days by Judge Robert Holloway, starting on February 16, 2010. Many of the same witnesses who had testified at the first trial also appeared for the second trial, but the testimony of most of the witnesses came in through the reading of their depositions. Other depositions were shown to the jury on videotape.

---

[5]The content and order of questions on the verdict form were in conformity with the Tennessee Supreme Court's rulings about the interaction between the principles of comparative fault, as first set out in *Balentine v. McIntyre*, 833 S.W.2d 52 (Tenn. 1992), and the requirements of the Workers' Compensation Law, Tenn. Code Ann. § 50-6-101 et seq.

Mr. Johnson testified in person. He explained that he was following his normal procedures in his supervision of the transfer station on the day of the accident, and he denied that he was standing too close to the truck, pointing out that his position enabled the driver to see his hand signals through the truck's side view mirror. He admitted, however, that if he had been standing further away he could have avoided injury.

Mr. Johnson testified that he remembers very little about his stay at Huntsville Hospital. He was discharged from the hospital twelve days after the accident. He had to be carried from the car into his house because he couldn't walk. His wife had a hospital bed moved into the couple's living room, to enable her husband to look out the picture window. She slept on a mattress on the living room floor, so she would always be nearby to help with his basic needs, including daily catheterization. The couple's two young daughters slept on the mattress with their mother. Three or four months after the accident, Mr. Johnson had recovered enough that he could be helped into a wheelchair for a trip to Wal-Mart. About five or six months after the accident, he was able to use a walker. A few months later, he switched to crutches.

Mr. Johnson testified that he continues to suffer from pain in his left leg and his back, and he has difficulty sleeping. Although he underwent urethral surgery, he continues to suffer from urological problems. He takes medication for pain, for depression, and to treat urinary problems. He has monthly pharmaceutical expenses of about $1,000. Sexual relations with his wife require the use of medical aids and devices that were described in detail during questioning. Mr. Johnson also acknowledged under questioning that in 1995 he was treated for stress related to the death of his father-in-law, and that he took an anti-depressant for a number of months. He also sought treatment for frequent urination prior to the accident, and he was given a prescription to treat that condition.

The deposition of Dr. Charles Haney, Mr. Johnson's family practitioner, was read into the record. Dr. Haney testified that he had been Mr. Johnson's personal doctor for over twenty years, and he confirmed that he had treated Mr. Johnson for stress and for urinary problems prior to the accident. He stated, however, that Mr. Johnson's urinary problems and anxiety were far worse after the accident than they had ever been before. He also testified as to Mr. Johnson's character, stating that "he is an honest and hard-working family man," and that he had made the best effort he could to recover from his injuries.

The deposition testimony of Dr. Gary Strickland, a neurologist, was also read into the record. He testified that he began treating Mr. Johnson for chronic pain in 2004. He further testified that the patient's pain was caused by damage to the lateral femoral cutaneous nerve in his thigh, that the pain had to be treated with daily medication, and that to a reasonable degree of medical certainty, the condition was a permanent one. A letter from Dr. James

Flatt, Mr. Johnson's urologist, was entered into the record. It stated that urethral strictures resulting from Mr. Johnson's accident placed him at an increased risk of urinary tract infections, and that Dr. Flatt had treated him in the hospital for at least one such infection.

The plaintiffs called consulting mechanical engineer Roger Dean Harris as an expert witness. He testified at length and was cross-examined closely. He stated that he had visited the transfer station and the Torrington factory, examined and measured the waste container, talked to engineers at the factory where the hoist was manufactured, and studied the manuals for the hoist and for the truck.[6] He concluded that the root cause of the accident ". . . was the chain separating from the door and allowing the door to swing. That caused an already unstable box to fall off of the truck."

Mr. Harris testified that either the chain itself broke or a weld on the bracket to which the chain was hooked failed, or the safety catch had broken or come loose, causing the door to swing free. He could not definitively conclude which of those possibilities was the correct one. However, he pointed out that all the welds and metal parts involved were subject to corrosion, and he discussed in detail several flaws he had observed in the welds that made them more prone to failure.

Mr. Harris admitted under cross-examination that if the container had been securely fastened, it would not have fallen off the truck, even if the door was swinging loose. But he testified that because of the unusual size and shape of the container, it was incompatible with the attachment features of the hoist, and thus could not be safely and securely fastened. He also observed that the container was top-heavy, which increased its potential instability when the door was in motion.

Another expert witness called by the Plaintiffs was Gerald John Hietpas, a professional engineer with extensive experience in the field of industrial maintenance. He testified that he had inspected the Torrington plant and found it was a large and sophisticated operation. Because Torrington owned the waste containers it used, he declared it to be the company's responsibility to properly maintain them, and he stated that the company should have placed them on its preventative maintenance program. Torrington's maintenance supervisor testified, however, that there was no maintenance schedule for the containers and that he didn't know why not.

Mr. Hietpas further testified that he noticed in his factory inspection that numbered brass inventory tags were fastened to other pieces of equipment owned by the company, but

---

[6]It is undisputed that there were no manuals for the container itself.

that there were no such tags on the waste containers. He accordingly theorized that it was possible that Torrington did nothing to maintain the containers because the workers in charge of maintenance did not realize that they were owned by the company.[7] He also said that a five or ten minute inspection of the container every time it came back from BFI would have been sufficient to discover any potential problems, such as a failing weld, a rusting or deformed chain, or a malfunctioning latch, that Torrington had capable personnel with the skills to repair any such items, and that a failure to do so was below the standard expected in a factory like Torrington's.

Larry Edward Bishop, Torrington's plant manager, testified by deposition that the Pulaski plant employed a workforce of 500 to 600 people, including ten engineers. He agreed that it was Torrington's responsibility to make sure that the containers remained in good shape after the date of their purchase. He admitted that no one at Torrington inspected the containers for repairs or for any maintenance they might need. Torrington's former and current maintenance supervisors also admitted that they had not ordered any maintenance on the containers.

Another witness called by the Plaintiffs was Coveak Moody, a former safety supervisor for BFI. He testified that BFI entered into a service contract with Torrington because Torrington owned the containers at issue. BFI's responsibilities under such a contract are to pick up the container at their customer's property, dispose of the contents, and then return it. Another type of contract that BFI uses is a rental contract, wherein BFI owns the container, maintains it, cleans it, and make sure it is in safe working order.

Mr. Coveak acknowledged under cross-examination, however, that regardless of the type of contract involved, it was BFI's job to make sure that the container was properly secured to BFI's truck and to dump it safely. He also acknowledged that BFI's safety manual directed drivers to report damaged containers or safety equipment to their supervisors and that it also warned employees not to place themselves or anyone else behind a container while it was in a tilt position.

Portions of driver Clayton Eslick's deposition were read into the record. He testified that he didn't like to haul Torrington's container because of the way it was built and because the metal it was filled with made for a heavier load than most: "I didn't like hauling the box. It was my job and I had to do it, but it was a dangerous box to haul." He also testified that the container could be safely transported, so long as it was hooked into the front stops when

---

[7]Mr. Hietpas' theory was confirmed by Torrington's current maintenance supervisor, who testified that when he first took the job, he did not order any maintenance on the containers because "we actually thought they were actually owned by BFI or Wastequip or someone else."

it was pulled to the front of the truck bed.

But he further stated that there was no way to secure it after it was rolled to the back of the truck for unloading, and that at that point, it just sat on the rails, with the weight of the box the only thing keeping it in place.[8] Mr. Eslick also testified that immediately before the accident he handled the chain that was supposed to hold the door in place and he didn't see anything wrong with it, but that after the accident he noticed that it had broken.[9]

At the conclusion of the plaintiffs' proof, the defendant moved the court for a directed verdict. The trial court denied the motion. The defense then called David John Murphy, who had worked for BFI prior to 1998 and also after 2002, training drivers and other personnel in safety matters. He testified to the existence of a safety video for drivers of roll-off trucks that was used by the company during his first stint there. Mr. Murphy was also asked to read an excerpt from a section in an employee manual titled "Roll-Off Guidelines." The excerpt declared it was the driver's responsibility to make sure the dumping process is safe, to "[m]ake sure chain is in good condition and has a secure locking mechanism to hold door open," and to "[n]ever place yourself or anyone else behind or under a container while it is in the lift position."

Mr. Murphy also testified that drivers were supposed to "look over" the containers before they hauled them to make sure they were safe, that they could refuse to carry any load that they believed was unsafe, and that if they found a customer-owned container to be unsafe, they were instructed to notify the owner of the problem. Mr. Murphy acknowledged on cross-examination, however, that if BFI contracted to dump waste from a container owned by another party, the other party had a responsibility to inspect and maintain its container.

The defendant also called its own expert witness, a mechanical engineer named George Michael Saunders, Jr. He had also inspected Torrington's two containers and BFI's truck and hoist, and he disagreed with the conclusions reached by the plaintiffs' experts. He testified that in his opinion the swinging of the rear door would have not have been sufficient to tip the container over if it had been positioned correctly on the hoist during or after the unloading operation. He theorized that perhaps the driver had let the container bang against

---

[8]Mr. Eslick acknowledged that the cable was still attached to the container during dumping, but the expert witnesses testified that the cable could not restrain the side-to-side motion of the container.

[9]The proof showed that a welder fastened a new chain on the box after the accident, and that the original chain was lost or misplaced prior to the first trial.

the ground to free up some of the load,[10] and that maybe the driver had pulled forward while the container was still in contact with the ground, thereby dragging the container out of its rails.

In any case, Mr. Saunders declared that it was BFI's responsibility to properly secure the container to the hoist, and that there was nothing that Torrington did or failed to do that caused the container to fall off the truck. He also testified that, contrary to Mr. Harris' testimony, stops and ratchet straps could have been used to secure the container. He explained that BFI could have modified the truck by installing intermediate fold-down stops (available from the manufacturer) to hold a short container in place after it was slid down to the back of the truck bed, and that the driver could have secured the ratchet tie-down straps to the container when he was opening and securing the rear door prior to dumping.

At the conclusion of proof, the judge recited the jury instructions and the jury heard closing arguments. The jury then retired to deliberate and returned with a verdict two and a half hours later. The first question on the two page verdict form given to the jury was the same as it was at the first trial: "Do you find the conduct of Plaintiff James Johnson's employer, BFI/Allied Waste, was the sole cause in fact of the Plaintiff's injuries?" This time, the jury answered "No." In accordance with its instructions, the jury then went on to answer the follow up questions, and it allocated fault between the only remaining defendant (The Torrington Company) and plaintiff Johnson, finding Torrington to be 90% at fault for Mr. Johnson's injury and Mr. Johnson himself to be 10% at fault. In response to the damages question, the jury found that Mr. Johnson had suffered $3 million in damages and that his wife's damages for loss of consortium claim was $500,000.

Torrington filed a Motion for Judgment Notwithstanding the Verdict, a Motion for New Trial, and a Motion for Remittitur. The trial court overruled the Motions for J.N.O.V. and new trial, but suggested a remittitur of $250,000 for Mrs. Johnson's damages. The reduction from the total damages for Mr. Johnson's comparative fault and for the remittitur resulted in a net final judgment for the plaintiffs in the amount of $2,925,000. This appeal followed.

## V. THE DECISION TO VACATE THE FIRST VERDICT

Torrington's first argument on appeal is that the trial court erred when it vacated the first jury verdict because it misapplied the thirteenth juror rule. In this state, the trial judge

---

[10]Several witnesses testified that "jogging" the container in this way is sometimes used to remove stubborn waste during unloading operations, but Mr. Johnson and Mr. Eslick both testified that this was not done on the day in question.

is considered to be the thirteenth juror, and no verdict is valid until the trial judge approves it. *Washington v. 822 Corp.* 43 S.W.3d 491, 494 (Tenn. Ct. App. 2000); *Shivers v. Ramsey*, 937 S.W.2d 945, 947 (Tenn. Ct. App. 1996). The thirteenth juror rule requires the trial court to independently weigh the evidence, to determine the issues, and to decide whether the verdict is supported by the evidence. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 717-18 (Tenn. Ct. App. 1999); *Ladd v. Honda Motor Co.*, 939 S.W.2d 83, 105 (Tenn. Ct. App. 1996). A trial judge that is dissatisfied with the verdict should set it aside and grant a new trial. *Loeffler v. Kjellgren,* 884 S.W.2d 463, 468-69 (Tenn. Ct. App. 1994). The reason the trial judge is required to assume that role is because,

> the circuit judge hears the testimony, just as the jury does, sees the witnesses, and observes their demeanor upon the witness stand; that, by his training and experience in the weighing of testimony, and the application of legal rules thereto, he is especially qualified for the correction of any errors into which the jury by inexperience may have fallen, whereby they have failed, in their verdict, to reach the justice and right of the case, under the testimony and the charge of the court . . .

*State v. Moats,* 906 S.W.2d 431, 433 (Tenn. 1995)(*quoting Manning v. State,* 292 S.W. 451, 457 (Tenn. 1927)).

Torrington argues, however, that the trial court's decision to set aside the jury verdict was in error because it was not entered until ten months after the court approved the verdict and because "delay prevents use of the thirteenth juror rule." As authority for that proposition, the defendant cites Tenn. R. Civ. P. 59.05, which governs the court's power to alter or amend a judgment or to grant a new trial after entry of a judgment. That rule allows the court to order a new trial on its own motion only if it does so within thirty days of the entry of judgment. If it fails to do so, then the judgment becomes final.

In this case, however, the trial court did not act on its own motion, but rather in response to the plaintiffs' motion for new trial, which was filed and served within thirty days of the entry of judgment, pursuant to Tenn. R. Civ. P. 59.02. When a party files a post-trial motion under Rule 59, the court's judgment is suspended or stayed until it rules on the motion. The court is not required to rule on the motion within any particular time frame. *See Webb v. Aetna Life Ins. Co.,* 496 S.W.2d 511, 512 (Tenn. Ct. App. 1973).

Torrington notes, however, that our Supreme Court has stated that while the thirteenth juror rule is meant to be a safeguard against a miscarriage of justice by the jury, "[t]he more time that passes between the trial and the trial court's evaluation of the evidence as the thirteenth juror, the less meaningful the safeguard becomes." *State v. Moats,* 906 S.W.2d at

435.  The reason is that with the passage of time, the trial court's independent recollection of the demeanor and credibility of all the witnesses is apt to decline.  *Id.*

We agree with the defendant that it is the best for the trial court to act promptly on a motion for new trial, while the testimony of the witnesses is still fresh in the judge's mind. Nonetheless, delay does not render the trial court ineligible to perform its duty as thirteenth juror.  For example, in the case of *Ladd v. Honda Motor Co.*, *supra,* fifteen months elapsed between the jury verdict and the trial court's review.  The plaintiff argued that the delay prevented the trial court from adequately performing its function as thirteenth juror.  This court disagreed, stating that "[t]he passage of time alone provides no basis for concluding that the trial court could not or did not properly review the verdict."  *Ladd v. Honda Motor Co.*, 939 S.W.2d at 105.

The relevant order in this case simply stated that the judge had made an independent examination of the evidence, found that the jury verdict was against the weight of the evidence, and ordered a new trial.  There is nothing on the face of that order to suggest that the judge misunderstood his role as thirteenth juror, and we have found no statement by the judge in the record that might require us to undertake a deeper analysis of his mental processes.  Torrington argues, however, that the trial court's decision was based on the three juror affidavits that were attached to its motion for new trial, that the affidavits did not contain information that it was proper for the trial court to consider, and therefore that the court's decision was tainted by the improper information.  There is nothing in the record, however, other than the affidavits themselves, to support this theory.

Torrington also argues that "as the thirteenth juror, the trial court disregarded undisputed evidence."  In support of that proposition, the company recites in detail the testimony of witnesses at the first trial who testified that it was BFI's duty to secure the container properly and to dump its contents safely, and that BFI failed to perform those required duties.  Torrington does not mention, however, that other witnesses testified that Torrington had a duty to maintain its own containers and keep them in good repair, that Torrington made no effort to do so, and that the failure of a simple device on Torrington's container, meant to secure the rear door during the dumping process, was a root cause of the accident.

## VI. DEFENDANT'S OBJECTIONS TO THE SECOND VERDICT

### A.  The Jury Verdict Standard of Review

The standard of review we must apply to a jury verdict approved by the trial court is set out in Tennessee Rule of Appellate Procedure 13(d), which provides that "[f]indings of

fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Our Supreme Court has discussed that standard of review as follows:

> It is the time honored rule in this state that in reviewing a judgment based upon a jury verdict the appellate courts are not at liberty to weigh the evidence or to decide where the preponderance of the evidence lies, but are limited to determining whether there is material evidence to support the verdict; and in determining whether there is material evidence to support the verdict, the appellate court is required to take the strongest legitimate view of all the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary.

*Crabtree Masonry Co. v. C & R Construction, Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978). *See*, *also, Overstreet v. Shoney's* 4 S.W.3d 694, 717 (Tenn. Ct. App. 1999); *Black v. Quinn*, 646 S.W.2d 437, 439-40 (Tenn. Ct. App. 1982).

### B.  The Motion for J.N.O.V.

Torrington argues that the trial court erred by not granting its motion for Judgment Notwithstanding the Verdict (J.N.O.V.). In ruling on such a motion, the court must take the strongest legitimate view of the evidence in favor of the non-moving party, discard all countervailing evidence, and may grant the motion only if, after assessing the evidence according to that standard, it determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence. *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994); *Holmes v. Wilson*, 551 S.W.2d 682, 685 (Tenn. 1977). If there is any doubt as to the proper conclusions to be drawn from the evidence, the motion must be denied. *Eaton v. McLain*, 891 S.W.2d at 590.

The standard for ruling on a J.N.O.V. motion differs from the standard for ruling on a motion for new trial under the thirteenth juror rule, in that the trial court and the appellate court may not weigh the evidence or assess the credibility of the witnesses when ruling on a motion for J.N.O.V. *Holmes v. Wilson*, 551 S.W.2d at 685; *Potter v. Ford Motor Co.*, 213 S.W.2d 264, 268 (Tenn. Ct. App. 2006); *Mairose v. Federal Express Corp.*, 86 S.W.3d 502, 511 (Tenn. Ct. App. 2001). Under that standard, "[i]f there is material evidence to support the jury's findings, then, of necessity, the case may not be taken from the jury." *Holmes v. Wilson*, 551 S.W.2d at 685; *Potter v. Ford Motor Co.*, 213, S.W.2d at 268.

Torrington attempts to establish its entitlement to J.N.O.V. by characterizing the case as one for negligent inspection and by emphasizing evidence that suggested that if there was

a defect in the chain or in the device for hooking the rear door into the side of the container, such defect could not have been detected by ordinary inspection. For example, it points to Mr. Eslick's testimony that he handled the chain on the day of the accident and did not see anything wrong with it, and it states that "[t]here is no evidence and no reason to infer that Torrington could have seen something that was not visible to Mr. Eslick." Thus, Torrington implies that there was no material evidence to support an essential element of the plaintiffs' claim: that Torrington's breach of its duty to inspect the chain for visible problems was a cause in fact of Mr. Johnson's injuries.

But Torrington ignores the evidence that contradicts its argument. Torrington's own plant manager admitted that it was the company's responsibility to make sure that the containers remained in good condition and that no one at Torrington inspected them for repairs or for any maintenance they might need. Two of Torrington's safety supervisors confirmed that the containers were excluded from any regular inspection and maintenance schedule. Mr. Hietpas, the plaintiffs' expert witness, testified that regular inspections by Torrington's engineers would have been sufficient to discover any potential problems, such as a failing weld, a rusting or deformed chain, or a malfunctioning latch. He also testified that Torrington had the resources needed to correct any such problems. There was thus ample material evidence to support the jury verdict, thereby showing that Torrington was not entitled to J.N.O.V.

## C. The Allocation of Fault Between Defendant and Plaintiff

As we explained above, the first question asked on the jury verdict form was whether BFI's conduct was the sole cause in fact of the plaintiffs' injuries. The second jury answered that question in the negative. The jury was then instructed to allocate the percentage of fault between defendant Torrington and Mr. Johnson, with the total to add up to 100%. The jury followed these instructions, and found Torrington to be 90% at fault for the accident, and Mr. Johnson to be 10% at fault.

Torrington asserts that the proof overwhelmingly showed that Mr. Johnson was standing too close to the container and that he himself admitted that he would not have been struck if he had been standing further away. It accordingly argues that the jury's allocation of fault "is contrary to the manifest weight of the evidence," and that in accordance with *Jones v. Idle,* 114 S.W.3d 911, 913 (Tenn. 2003), "the trial court must treat this defect as an error in the finding of liability itself."

But, *Jones v. Idle* is not on point with the present case. The jury in that case found the

plaintiff to be 90% at fault and the defendant/counterplaintiff to be 10% at fault, resulting in no recovery for the plaintiff under the principles of modified comparative fault. Exercising its role as thirteenth juror, however, the trial court found that neither party had carried its burden of proof. It accordingly set the verdict aside and ordered a new trial. This court and our Supreme Court affirmed the trial court's action, holding that "a trial court is not allowed to reallocate the percentages of fault determined by the jury once it disagrees with the weight of the evidence as the thirteenth juror," but must rather order a new trial. *Jones v. Idle,* 114 S.W.3d at 913.

In contrast with *Jones v. Idle*, the trial court in the present case approved the jury verdict. We have found that there is material evidence in the record to support the verdict and the judgment based on it, and neither we nor the trial court have suggested that the allocation of fault needs to be adjusted. Further, contrary to Torrington's suggestion that Mr. Johnson's fault had to be greater than its own, the proof showed that Mr. Johnson would not have been injured, regardless of where he was standing, if the device holding Torrington's door in place had not unexpectedly broken. We acknowledge the possibility that under the facts of this case the jury could have allocated fault differently than it did, thus reducing Torrington's liability, but we do not find that its verdict was contrary to the manifest weight of the evidence.

## D. The Exclusion of BFI from the Calculation of Fault

Torrington also complains that the verdict makes it liable not only for its own quantum of fault for causing Mr. Johnson's injuries, but also for the fault of BFI, whose negligence was clearly a significant factor in the accident. The defendant argues that by absolving BFI of all liability and shifting that liability to Torrington, the verdict contravenes one of the primary purposes behind our Supreme Court's adoption of a system of comparative fault, which is to guarantee that "[a] particular defendant will henceforth be liable only for the percentage of a plaintiff's damages occasioned by that defendant's negligence . . ." *Balentine v. McIntyre*, 833 S.W.2d 52, 58 (Tenn. 1992).

Torrington acknowledges, however, that the decision in this case is consistent with the Supreme Court's holding in the recent case of *Troup v. Fisher Steel*, 236 S.W.3d 143 (Tenn. 2007), and in earlier cases which attempted to harmonize the principles of comparative fault set out in *Balentine v. McIntyre*, with the Workers' Compensation Law. The first of these was *Ridings v. Ralph M. Parsons Co.*, 914 S.W.2d 79 (Tenn. 1996) , in which the Court declared that "the rationale of *Balentine v. McIntyre* postulates that fault may be attributed only to those persons against whom the plaintiff has a cause of action in tort." *Ridings v. Ralph M. Parsons Co.*, 914 S.W.2d at 81. The Court therefore concluded that no fault can be attributed to an employer that is immune in tort under the Workers'

Compensation Law.  *Id*. at 82.

In the subsequent case of *Snyder v. LTG Lufttechnische GmbH,* 955 S.W.2d 252 (Tenn. 1997), the Court clarified its holding in *Ridings.*  It ruled that in order to give a jury the fullest possible understanding of the facts of a case, a defendant should be allowed to argue that the actions of an employer that is immune from liability in tort under the Workers' Compensation Law were a cause in fact of the plaintiff's injury.  It did not permit juries to allocate any share of liability to that immune employer.   Thus, in cases where immune parties and non-immune defendants were both at fault for a plaintiff's injury, juries were still required to allocate 100% of the liability between the non-immune defendants and the plaintiff.

The case of *Carroll v. Whitney*, 29 S.W.3d 14 (Tenn. 2000), gave the Court the opportunity to examine the question of allocation of fault in the context of a negligence action against a group of defendants that included two resident physicians who were immune from suit because they were state employees.  The Court substantially altered the rule enunciated in the earlier cases in order to "create a tighter fit between liability and fault." *Id.* at 18.  It ruled that "when a defendant raises the nonparty defense in a negligence action, a jury may **generally** apportion fault to immune nonparties." *Id.* at 19. (emphasis added).

The ruling meant that in most situations the fault of an immune nonparty could be applied to a finding of damages to reduce the liability of a non-immune defendant.  Thus, for example, if the jury found an immune non-party to be 30% liable for the plaintiff's injury, the plaintiff would  be able to recover at most 70% of his damages from the defendant or defendants. But the court still excluded from this general rule cases involving employers that are immune under the Workers' Compensation Law, for reasons upon which it further elaborated in the case of *Troup v. Fisher Steel, supra*.

In *Troup,* the Court discussed the impact of Tenn. Code Ann. § 50-6-112(c)(1) of the Workers' Compensation Law on the potential recovery of an injured employee.  That statute gives an employer who has paid workers compensation to an injured employee a subrogation lien for the full amount it has paid to the employee against any award or settlement the employee obtains against a negligent defendant.  The court was concerned that applying the same general rule set out in *Carroll v. Whitney* to cases involving immunity under the Workers' Compensation Law meant that,

> plaintiffs would be subject to a double reduction of their recovery against third
> parties who contributed to their on-the-job injuries.  The first reduction would

-17-

occur when the jury apportioned fault to the employer. The second would occur when the workers' compensation carrier exercised its right to subrogation against the plaintiff's recovery from the third party.

*Troup,* 236 S.W.3d at 147.

The *Troup* court accordingly affirmed its rulings in *Ridings* and *Snyder*, in cases involving immunity under the Workers' Compensation Law. It was not fully satisfied with that result, however, because it realized that it could lead to an inequitable judgment, since Tenn. Code Ann. § 50-6-112(c) "allows an employer to pursue its full subrogation interest against an employee's recovery regardless of the employer's degree of fault." Thus, while protecting an injured employee from a double reduction in his recovery, the Court's ruling raised the possibility that a non-immune defendant that was only partially at fault for a plaintiff's injury would have to bear liability both for its own fault and that of a negligent employer. The court accordingly invited the General Assembly to amend Tenn. Code Ann. § 50-6-112(c) to prevent an employer from recovering workers' compensation payments if it is found to be at fault for its employee's injuries. *Troup v. Fisher Steel*, 236 S.W.3d at 147, fn. 2. As of the date of this opinion, however, the General Assembly has not enacted the requested amendment.

Torrington asks this court to amend the judgment against it in order to return to the basic principle set out in *Balentine v. McIntyre*, that a defendant should not be taxed with any liability for an injury beyond the extent of its actual fault. But this court has no authority to overrule a decision of our Supreme Court. Thus, we are unable to grant the defendant's request.

### E. The Amount of the Verdict

Defendant Torrington's final argument is that the amount of the verdict was excessive, and it asks this court to order a further remittutur on the judgment. In support of its argument, Torrington attempts to minimize the severity of Mr. Johnson's injuries. It notes that he has recovered sufficiently from those injuries to be able to return to work and that he received treatment for depression and for urinary problems even before the accident worsened those problems.

The proof showed, however, that Mr. Johnson's injuries were severe, and that his physical impairment is permanent. Although he has managed, through force of will, to return to work, he continues to suffer from chronic pain, he must take frequent bathroom breaks, and he has suffered several falls at work when his left leg suddenly gave out. Even short trips in the automobile have become difficult and must be carefully planned. Mr. Johnson

used to hunt and take care of his yard. He can no longer hunt, and his wife now does much of the yard work. Although previously sociable and outgoing, he has become withdrawn and depressed. It is beyond dispute that his life and that of his wife have been changed forever as a result of the accident.

The jury in this case was instructed as to various components of a compensatory award, including medical expenses, loss of income, loss of future income, pain and suffering, and loss of enjoyment of life. The verdict form, however, did not require the jury to quantify each of these components, but only to enter the total amount of damages each of the plaintiffs has suffered. The jury found Mr. Johnson's damages to be $3 million. Appellate courts may reduce or invalidate a judgment when the amount of the verdict is so excessive or unconscionable that it shocks the judicial conscience and amounts to a palpable injustice. *Duran v. Hyundai Motor America, Inc.*, 271 S.W.3d 178, 212 (Tenn. Ct. App. 2008). That is not the situation in the present case. We accordingly affirm the award.

The jury also found Mrs. Johnson's damages for loss of consortium to be $500,000. The trial court exercised its power to suggest a remittitur of that verdict to $250,000. The plaintiffs ask us to restore the original amount of the verdict. Under Tennessee law, the trial court is authorized to grant a remittitur if the court determines that the verdict of the jury is excessive. *Palanki ex rel. Palanki v. Vanderbilt Univ.*, 215 S.W.3d 380, 387 (Tenn. Ct. App. 2006). Our review of the trial court's remittitur decision is governed by Tenn. R. App. P. 13(d), which presumes the factual findings of the trial judge to be correct unless the evidence in the record preponderates against them. *Palanki,* 215 S.W.3d at 386. In this case, we do not believe that the evidence preponderates against the trial court's suggestion of remittitur.

## VII. CONCLUSION

The judgment of the trial court is affirmed. We remand this case to the Circuit Court of Giles County for any further proceedings necessary. Tax the costs on appeal to the appellant, the Torrington Company.

_____
PATRICIA J. COTTRELL, JUDGE